# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## D. SAYLER GOOD v. FRANK R. PETTICREW AND MAUDE E. PETTICREW.

January 16, 1936.

Present, Campbell, C. J., and Hudgins, Browning, Chinn and Eggleston, JJ.

The opinion states the case.

*Hall, Buford & Leftwich,* for the appellant.

*Horace M. Fox,* for the appellees.

CHINN, J., delivered the opinion of the court.

This suit was instituted by D. Sayler Good (hereinafter referred to as complainant) against Frank R. Petticrew and Maude E. Petticrew (sometimes referred to as respondents) for the purpose of obtaining an injunction against respondents to compel the removal of two gates across the private right of way appurtenant to the land of the complainant, over the adjoining land of the respondents; to compel the removal of certain other obstructions alleged to have been placed in said right of way by respondents, and to enjoin respondents from any further interference with or obstruction of said right of way. From a decree denying the injunction and dismissing the bill complainant appeals.

It appears that both of the tracts of land referred to at one time belonged to F. C. Collings. In the spring of 1924 Collings sold the land now owned by the complainant, consisting of six and six-tenths acres, to complainant's brother, C. M. Good. This tract is bounded on the north by the Poage's mill road, and at the time it was sold to C. M. Good was bounded on the west by other land belonging to Collings, which he afterwards conveyed to the respondents. A little south of the public road above mentioned there is a stream known as Back creek, which runs practically parallel with said road in an easterly direction, across the land of the complainant, the land now belonging to the respondents, and land still owned by F. C. Collings.

At the time Collings sold the six and six-tenths acre tract to C. M. Good, he lived in a house located on the southern part of said tract. Access to this house was obtained by a private road leading from the said public road in a southerly direction, about halfway between the east and west boundary lines of the tract now owned by the complainant, crossing Back creek at a ford. When Collings sold this tract to C. M. Good, he decided to put a bridge across Back creek entirely on his own land, and selected a place for the bridge about eighteen feet west, at its nearest point,

from the division line of Good's land. To erect this bridge Collings employed Henry Wiseman and his son Harvey Wiseman, and also employed them to build a road from the bridge, paralleling the boundary line between his land and that sold Good, to a point about opposite. Good's house, with a branch road leading therefrom to a new house he was building for himself on the ten acres of land which he afterwards sold the respondents.

The land on which this road was constructed was at the time only an open field. There had been no roadway of any kind laid out for the reason there had been no necessity for any such road until Collings sold his home to Good and decided to build a new home for himself on the adjoining tract. There was no formal laying out of the road, it being constructed by the Wisemans from the bridge south to the point mentioned merely by dumping in the swampy places along the route dirt, gravel, cinders, etc., in order to make the road passable in wet weather.

As stated, the south end of the bridge across Back creek is eighteen feet from Good's property line. From the bridge the road in question gradually draws nearer the property line for several hundred feet, and then runs close thereto until its southern terminus is reached, thereby forming a triangle between the eastern edge of the road and the respondents' boundary eighteen feet at its base and several hundred feet long.

After the bridge and road had been constructed by Collings he proposed to Good that if he would join him in the expense of building the bridge and maintenance of the road, he could have the use of same to gain access to his place, instead of having to ford the creek as Collings had previously done. Good agreed to this and paid half the cost of the bridge, and the parties entered into a written agreement bearing date of July 5, 1924, which, so far as pertinent, reads as follows:

"That for and in consideration of the sum of One Dollar cash in hand paid, the receipt whereof is hereby acknowledged, and other consideration, the party of the first part

(Collings) agrees that the party of the second part (C. M. Good) shall have the right and privilege of using the road and bridge on the lands of the first party and paralleling the division line of the above parties, and it is further agreed that the future maintenance expense on said road shall be paid jointly, the second party paying one-third such expense, so long as he wishes to use the road."

In 1931 Collings sold the respondents the ten acres of his original tract on which he had constructed the bridge and roadway, and had built his new house. This ten acres adjoins the western boundary of complainant's tract, which runs southerly in a straight line from the public road above mentioned for some little distance beyond the southern terminus of the right of way in controversy.

Before Collings sold this property to the Petticrews, he and C. M. Good had made an agreement to run a division fence, and Collings actually erected the fence between them on the southern boundary of Good's land and on the western boundary to the point where the right of way in question crosses the boundary line to enter Good's premises. Good was to build the fence from that point north, but failed to do so.

After the Petticrews had purchased the land they began at once to improve their property, and found it necessary to enclose it to protect their crops and lawn from depredation by roving live stock, and trespassers. They thereupon completed the division fence, from where Collings had left off, northerly along the property line to a point about opposite the bridge. They also erected a cross fence from the division fence in a westerly direction to the land still owned by Collings. This fence crosses the right of way a short distance south of the bridge. Upon the erection of these fences, the Petticrews put a ten foot gate in the fence which crosses the right of way just south of the bridge, and a like gate in the division fence at the south end of the right of way, where the road leads across the property line into complainant's premises.

Complainant acquired the six and six-tenths acres con-

veyed by Collings to C. M. Good, in 1929, and now complains of these two gates, insisting that he is entitled to a sixteen foot road, without gates or other obstructions.

Complainant's title to the right of way over what is now the land of the respondents is derived entirely from the contract of July 5, 1924. This contract does not specify any width for the road. The evidence shows that the road was laid out and constructed by Collings before the contract was executed, and at that time it consisted of a narrow driveway which had been built up in the manner hereinbefore described for Collings' own use. The only evidence produced by complainant tending to show that the road was sixteen feet in width at the time the contract was executed was that of an old colored man named John Bailey, who testified that he was employed by Mr. Collings to construct the road and plowed out drains on each side, the drain on the western side being sixteen feet from the division line by actual measurement.

On the other hand, it was testified by Collings and the Wisemans that the Wisemans built the bridge and the road and the only work that John Bailey ever did on the road was in the winter of 1925, when he assisted a man employed by C. M. Good to run a road scraper over it.

Mrs. C. M. Good, who lived at the place from the time her husband purchased it in 1924, until sometime after it was acquired by complainant, testified she did not know the width of the road, but it was just a one-way road and cars could pass on it by putting one wheel in the ditch on either side. Since the contract was executed the evidence is that the roadway has been improved from time to time by draining, by dumping cinders and gravel on the road bed, and by digging ditches at the low places for the purpose of carrying off the water. As stated, at the time the road was built and the contract entered into, it was not necessary to have anything more than a one-way road through the field to be kept in such condition that Collings could get to and from the dwelling and premises now owned by the Petticrews, and there is no evidence to show

that it was then contemplated by him or C. M. Good that there should be a sixteen foot right of way for Good's convenience, or that the roadway should be any wider than it was, or as might be necessary to enable Collings and Good to pass in and out to and from their homes.

It was held in *Palmer* v. *Newman,* 91 W. Va. 13, 112 S. E. 194, that where the width of a right of way is not specified in the grant, then it is limited to the width as it existed at the time of the grant.

While it appears that at some places where there are ditches on each side of the roadway there is a distance of sixteen feet between the ditches, the evidence clearly shows that the ditches were placed there in improving the road from time to time for drainage purposes, and not for the purpose of defining its width.

We are, therefore, of opinion that the lower court was plainly right in holding that the complainant is only entitled to a one-way road over the land of respondents.

It is contended that the court erred in holding that the respondents were entitled to maintain the two gates in question across the right of way. As has been stated, the gate across the road south of the bridge is in the fence erected by respondents from complainant's division line in a westerly direction, which fence is entirely on the land of the Petticrews, who own land on both sides of the right of way. It is well settled at common law, and also under the statute, that the Petticrews have a right to maintain this gate under the circumstances.

In *Davis* v. *Wilkinson,* 140 Va. 672, 125 S. E. 700, 703, the court quoted from Jones on Easements, sec. 407, as follows: "The rule is general that the land owner may put gates and bars across a way over his land which another is entitled to enjoy, unless, of course, there is something in the instrument creating the way, or in the circumstances under which it has been acquired or used, which shows that the way is to be an open one. The easement of way is for passage only. The land remains the property of the owner of the servient estate and he is en-

titled to use it for any purpose that does not interfere with the easement." See also, *Willing* v. *Booker,* 160 Va. 461, 168 S. E. 417; *Palmer* v. *Newman,* 91 W. Va. 13, 112 S. E. 194; *Collins* v. *Degler,* 74 W. Va. 455, 82 S. E. 265.

In the last named case it was held that where there were no fences before, the grant of a right of way does not preclude the servient owner from erecting gates where fences have been erected, and this does not preclude such erection of gates although the grant is a free right of way.

Code, 1930, section 2039 (26), provides: "Any person owning land over which another, or others, have a private road or right of way, except where it is otherwise provided by contract, may erect and maintain gates across such roads or right of way at all points at which fences extend to such roads on each side thereof." *Meadows* v. *Meadows,* 143 Va. 98, 129 S. E. 354; *Terry* v. *Tinsley,* 140 Va. 240, 124 S. E. 290.

It is contended by the complainant that the statute was not intended to apply to this case because the respondents only owned a strip of land eighteen feet wide between the division fence and the right of way, and the same was of little value. It is argued that the legislature did not intend by the statute to allow the erection of fences and gates where they will be of little benefit to the servient owner and of great inconvenience to the owner of the easement.

Whatever merit might be found in this contention under other circumstances, it has no application here. The gates in this instance come squarely within the provisions of the statute. It is, moreover, obvious that the fence erected by the Petticrews to protect their property on the north side would not avail anything if they had to stop at the road and could not connect with the division fence on their eastern boundary. In other words, they could not enclose their property at all unless they had a right to entend the fence across the right of way to the division fence between them and the complainant, or else run a fence all the way along the western side of the right of way in a

southerly direction, which would have necessitated throwing out all their land lying to the east of such fence, and crossing the entrance to their own house. The law does not place upon them any such obligation.

Neither can there be any question as to the right of the respondents to maintain the gate located in the division fence at the southern terminus of the right of way where complainant crosses the division line in passing from the right of way to his own property. "Ownership of land carries with it the right to a division fence on common boundaries of adjoining lands." Willing v. Booker, 160 Va. 461, 168 S. E. 417, 419. The right to erect the division fence necessarily carries with it the right of the respondents to erect the gate therein which is solely for complainant's use and convenience.

It is complained, however, that the respondents had placed rocks opposite this gate on the western edge of the right of way which so narrowed the road where it turned into the gateway as to interfere with the passage of vehicles through it. The evidence is that, in order to protect their lawn, which bordered the roadway at this point, respondents had placed rocks at the edge of the road twelve feet from the property line, which did not allow a sufficient turnout to enable long motor vehicles and wagons to pass through the gate without trouble. This situation, according to the evidence, constituted a just cause of complaint.

It appears, however, from the testimony of G. L. Poage, a witness for the complainant, and C. M. Malcolm, who testified for the respondents, both of whom are engineers, that the inconvenience in entering the gate on account of the rocks could be easily remedied by moving the division fence back three feet from the southern gate post, and placing said gate post five feet west on respondents' land from its existing location, thereby placing the gate in a position which would enable all vehicles to pass in and out to and from respondents' property without difficulty.

It appears that, acting upon this testimony, the judge

of the lower court invited the parties and counsel on both sides to accompany him in viewing the premises. The proceedings show that after making said view the judge became convinced that the opinion expressed by the engineers in their testimony was correct, and thereupon ordered the change to be made in accordance with their recommendations. After the location of the gate was changed, the judge again visited the scene in person, after notifying the parties and their counsel, but complainant refused to accept this settlement of the controversy; whereupon, the decree, adjudicating all matters in controversy as above stated and dismissing the bill, was entered by the court.

It is contended that the court erred in permitting, before the entry of the final decree, the respondents to change the location of the gate, and in finding that said gate as relocated did not interfere with complainant's right of way. We find no merit in this assignment. Complainant's entire case is based upon the contention that he is entitled to a sixteen foot roadway without gates or other obstructions. While it is perfectly true that complainant is entitled to a right of way over the road to and from his property, since he was not entitled, as we have seen, to a roadway sixteen feet in width, and respondents have a right to erect the gate in question, he could only justly claim a reasonably convenient passageway through the gate at the point referred to. This having been ordered and provided for by the court in accordance with the testimony of the engineers, complainant has no further cause of complaint, as he has obtained all the relief under the decree here complained of to which he is entitled.

It is next asserted that the court erred in attempting by views of the premises to make a finding of facts in the final decree, as to gates, not in evidence in the case, as to which facts complainant had no opportunity to cross-examine witnesses, or to disapprove such facts by other evidence. As previously stated, the court's first view of the premises was made in the presence of both parties

and their counsel without objection, and the change in the location of the gate was made in accordance with the opinions expressed by the engineers in their testimony. It, therefore, appears that there are no findings of fact in the final decree as to the gates not in evidence in the case. The second view of the court was made after the location of the gate had been changed, and merely in order that the court might satisfy itself by practical demonstration that the testimony of the engineers as to the results was correct.

It is finally contended that the court erred in holding that the respondents were entitled to recover their costs in this suit.

It appears from the evidence that, although the change in the location of the gate was not made until after all the testimony had been taken on both sides, the respondents had requested the complainant before the institution of the suit to meet them on the premises, with a view to changing the location of the gate in such a manner as would suit complainant's convenience, but complainant refused to meet respondents for this purpose, and proceeded to institute this suit upon the claim that he was entitled to a sixteen foot right of way, and respondents had no right to erect the gates in question.

Under these circumstances, although the change in the gateway was made during the course of the litigation, we do not think the chancellor abused his discretion in requiring complainant to pay the costs of the suit.

For the foregoing reasons, the decree of the lower court is affirmed.

*Affirmed.*